# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| DANA GIDDENS, | * | |
| Plaintiff | * | |
| v. | * | CIVIL NO.  JKB-10-3357 |
| COREPARTNERS, INC., *et al.* | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiff Dana Giddens, a resident of Virginia, sued her former employer, CorePartners, Inc., a Maryland corporation located in Frederick, Maryland, for an alleged failure to pay her earned wages, primarily in the form of annual bonuses, in accordance with her employment agreement (Count I) and with the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501 *et seq.* (LexisNexis 2008) (Count II).  (Am. Compl., ECF No. 14.)  In Count III, Giddens alleged the majority shareholders, Peter Oykhman and Boris Hadshi, and the outside director, Philip Damiano, had breached a fiduciary duty they owed to her by "(a) wrongfully dispersing corporate assets of Core Partners to enrich a member of the Board of Directors and/or (b) expending corporate funds on an inside stock purchase deal to enrich another member of the Board of Directors."  (Am. Compl. ¶¶ 74-75.)

CorePartners filed an eight-count counterclaim in which it alleged Giddens had violated her employment agreement's covenant not to compete (Counterclaim ("CC") I), had breached her duty of loyalty to the company (CC II), had breached a contract by which Giddens had promised to pay for personal expenses charged to company credit cards (CC III), had been unjustly enriched by not repaying her personal expenses (CC IV), was liable under the doctrine

of promissory estoppel for the same (CC V), was liable for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* (CC VI), was liable for trover and conversion (CC VII), and had breached her fiduciary duty regarding CorePartners's computer systems and information (CC VIII).  (ECF No. 8.)

Pending before the Court are three motions:

1.  Defendants' motion to dismiss Count III of the amended complaint (ECF No. 19);

2.  Plaintiff's motion to dismiss CC III and CC V-VIII (ECF No. 22); and

3.  Plaintiff's motion for partial summary judgment on Count II as to CorePartners's alleged violation of the MWPCL (ECF No. 30).

The motions have been briefed by the parties (ECF Nos. 23, 27, 31, 32, 35-37), and no hearing is necessary, Local Rule 105.6.  The Court will grant all three motions.  Following is the basis for the Court's ruling.

## *I. Background*

CorePartners provides software development services and inventory and warehouse management software products to its customers.  (Am. Compl. ¶ 8.)  As an independent contractor, Giddens provided professional services to CorePartners in 2006.  (*Id.* ¶ 9.)  On January 5, 2007, CorePartners hired Giddens to be its vice president of nonprofit operations.  (*Id.* ¶ 10.)  CorePartners and Giddens entered into an employment agreement on that same day.  (*Id.* ¶ 11.)  The employment agreement contained the following pertinent provisions:

- **2.1.**  Employment Term.  The Employee shall be employed by the Company under this Agreement on an "at will" basis commencing on the date of this Agreement and continuing until such employment terminates pursuant to this Section 2.

  . . .

- **3.1.**  Salary.  During the term of this Agreement, the Company shall pay to the Employee . . . compensation in the amount of $95,000.00 per year

or as otherwise set by the Board from time to time. Salary, less withholdings for federal, state and local taxes and any employee-paid benefits contributions/payments, shall be paid on no less than a monthly basis.

- **3.2.** <u>Bonus</u>. The Employee will earn and be eligible to receive and be vested in, and Company shall pay the Employee, subject to regular payroll deductions, an annual bonus equal to 1.25% of total CPI software development and consulting services revenue, . . . calculated over a 12 month period starting January 01 and ending December 31 (each an "Annual Bonus"). The Annual Bonus shall be paid within thirty (30) days after the end of each of the Company's fiscal year [sic]. In addition to Base salary and the Annual Bonus, Employee may receive spot bonuses in an amount as the Board may designate in its sole and absolute discretion, payable as determined by the Board.

  . . .

- **4.2.** <u>Vacation and Sick Leave</u>. The Employee will be entitled to [four (4)] weeks of paid vacation and seven (7) days of paid sick leave annually in accordance with policies established by the Company generally for executive employees . . . .

  . . .

- **9.1.** <u>Amendment</u>. This Agreement and the provisions of this Agreement may not be amended, modified or supplemented in whole or in part except by a written instrument making express reference to this Agreement and executed by all of the parties to this Agreement. No waiver of any provision of this Agreement shall be valid unless in writing, making express reference to this Agreement, and signed by the party against whom enforcement of such waiver is sought. The failure of any party at any time to insist upon strict performance of any provision of this Agreement shall not be construed as a waiver or relinquishment of the right to insist upon strict performance of the same provision at any future time.

- **9.2.** <u>Entire Agreement</u>. This Agreement sets forth all of the promises, agreements, understandings, warranties and representations among the parties to this Agreement with respect to the subject matter of this Agreement, and there are no other promises, agreements, understandings, warranties or representations, oral or written, express or implied, between them with respect to such subject matter. . . .

(Pl.'s Mot. Partial Summ. J. Ex. A, Att. Ex. 1, ECF No. 30 (second alteration in original).) Other provisions will be discussed within this memorandum as pertinent and necessary to the issues.

CorePartners paid Giddens her salary on a twice-monthly basis beginning in January 2007. (Am. Compl. ¶ 14.) Her annual salary was increased to $100,000 (*id.* ¶ 15), although it is unclear when this increase occurred. She acknowledges that she was paid all that she was due in salary, paid vacation, paid sick leave, and reimbursement of business expenses until the date of her resignation. (*Id.* ¶ 16.) In January 2008, CorePartners paid $77,928 to Giddens for her annual bonus for the work she had performed in 2007. (*Id.* ¶ 17.)

On January 28, 2008, Giddens became a minority shareholder when she purchased sixty shares of common stock of CorePartners from the two shareholders, Oykhman and Hadshi, for a total of $9,000 pursuant to a stock purchase agreement. (*Id.* ¶ 18-19; Pl.'s Mot. Partial Summ. J. Ex. A, Att. Ex. 2.) The total number of CorePartners shares on that date was 1,000. (*Id.*) Pursuant to the joinder agreement Giddens signed that same day (*id.* Att. Ex. 3), she agreed to be bound by the shareholders' agreement and the stock redemption agreement, neither of which is before the Court. Giddens continued to work for CorePartners as vice president of nonprofit operations through September 2, 2010, the date of her resignation, and fully performed her duties. (Am. Compl. ¶¶ 21, 33.)

## II. Defendants' Motion to Dismiss Count III of the Amended Complaint

All Defendants have joined in this motion, which contends Count III fails to state a claim and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. An inference of a mere possibility of misconduct is not sufficient to support a

plausible claim. *Id.* at 1950. As the *Twombly* opinion stated, "Factual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. In this case, Maryland law applies to the employment agreement as well as to the stock purchase agreement and the joinder agreement, and the cause of action is evaluated accordingly under Maryland law.

In Count III, Giddens alleges that Oykhman, Damiano, and Hadshi "as majority shareholders and/or directors of Core Partners had a fiduciary duty to Plaintiff as a minority stockholder to avoid waste of corporate assets, to avoid unlawful self-dealing, and to carry out the duties of majority shareholders and/or directors in faithful performance of their fiduciary duties." (Am. Compl. ¶ 74.) Further, Giddens alleges that she, as a minority shareholder, was injured by the alleged breaches of this duty by Oykhman, Damiano, and Hadshi. (*Id.* ¶ 76.)

Defendants argue that breach of fiduciary duty is not a recognized tort in Maryland and that, even if it were, the allegations are not personal to Giddens and may only be brought as a derivative suit by CorePartners. Moreover, even if she could include such a count in her lawsuit, she has failed to allege sufficient facts to state a claim for relief. (Defs.' Mot. Dismiss Supp. Mem. 4, ECF No. 19.)

After reviewing the relevant Maryland case law, the Court concludes that Defendants' motion should be granted. Essentially, Giddens's Count III confuses causes of action.

Two kinds of shareholder suits may be maintained. One is a shareholder's derivative suit, and the other is a suit for direct harm to a shareholder qua shareholder. The purpose of a shareholder's derivative suit "is to 'place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of "faithless directors and managers."'" *Shenker v. Laureate Educ., Inc.*, 983 A.2d 408, 423 (Md. 2009).

> The shareholder's derivative action was developed in the mid 19th century as an extraordinary equitable device to enable shareholders to enforce a corporate right that the corporation failed to assert on its own behalf. ***That right could include***

> *the recovery of losses occasioned by self-dealing or fraudulent or grossly*
> *negligent misconduct on the part of the corporate directors or officers.*

*Werbowsky v. Collomb*, 766 A.2d 123, 133 (Md. 2001) (emphasis added), *quoted in Boland v.*

*Boland*, 5 A.3d 106, 115 (Md. Ct. Spec. App. 2010), *cert. granted*, 10 A.3d 1180 (Md. 2011).

Giddens's amended complaint alleged Oykhman, Hadshi, and Damiano caused transfers

of money exceeding $60,000, in the time period of February 2010 through April 2010, to be

made from CorePartners to "Voronezh," a satellite office of the company's Moscow operation,

which then transferred the money to one or more off-shore accounts owned or controlled by

Oykhman. (Am. Compl. ¶¶ 40, 42.) She further alleged that, in August or September 2010,

Oykhman, Hadshi, and Damiano caused CorePartners to purchase shares in the company from

Hadshi at a price in excess of $800 per share, for a total amount of approximately $250,000. (*Id.*

¶¶ 44-45.) These allegations seem to fall squarely under the mantle of self-dealing, which is

properly the subject of a shareholder's derivative action. However, Count III does not satisfy the

prerequisites of such a lawsuit:

> In order to sue derivatively on behalf of the corporation, a plaintiff
> shareholder must overcome a number of procedural hurdles and demonstrate that
> he or she, rather than the corporation itself, should control the litigation.
> Specifically, before instituting suit, the derivative plaintiff either must make a
> demand on the corporation's board of directors to pursue the claim against the
> offending parties or demonstrate to the court that such demand would be futile
> due to the conflicting interests of the members of the board. Once demand is
> made, the corporation's board of directors must conduct an investigation into the
> allegations in the demand and determine whether pursuing the demanded
> litigation is in the best interests of the corporation. If the corporation, after
> investigation, fails to take the action requested by the shareholder, the shareholder
> may bring a "demand refused" action. ***In a derivative action, any recovery***
> ***belongs to the corporation, not the plaintiff shareholder.***

*Shenker*, 983 A.2d at 423-24 (emphasis added) (citations omitted).

Giddens has not alleged she made a demand on the company and she has not alleged a

demand would be futile. Even if she were to satisfy those procedural hurdles, she would still not

be able to maintain this count as a shareholder's derivative suit because the relief she seeks is

effectively disgorgement of the funds now in the possession of Oykhman and Hadshi followed by creation of "a constructive trust to pay Plaintiff's wage claims." (Am. Compl. ¶ 80.) Thus, although she might succeed on a shareholder's derivative suit in terms of factual allegations, the nature of the relief she seeks is not the proper object of such a suit because she only seeks the damages she alleges she is owed for breach of contract and the statutory claim under MWPCL. As the *Shenker* court noted, any recovery in a shareholder's derivative suit goes to the company, not the plaintiff shareholder.

Giddens denies that the shareholder's derivative suit is the proper vehicle in this case, instead asserting that she may maintain a direct action against the three directors for breach of a fiduciary duty to her. (Pl.'s Opp. 5, ECF No. 27.) The Court does not agree with Defendants' argument that Maryland does not recognize a tort for breach of fiduciary duty. Although the Maryland Court of Appeals has made clear that no omnibus tort so named exists, a cause of action for breach of fiduciary duty may proceed when a plaintiff identifies the appropriate fiduciary relationship, such as principal and agent or trustee and beneficiary, identifies how the relationship was breached, considers the available remedies, and selects the remedies appropriate to the plaintiff's problem. *See Kann v. Kann*, 690 A.2d 509, 521 (Md. 1997). Maryland cases also show that the courts have entertained causes of action premised on the violation of a fiduciary duty by a majority shareholder or director to a minority shareholder. *See, e.g.*, *Shenker*, 983 A.3d at 425; *Lerner v. Lerner Corp.*, 750 A.2d 709, 720 (Md. Ct. Spec. App. 2000).

Regardless, Giddens is unable to claim a direct harm to her *as a shareholder* that would support a direct action against the majority shareholders and directors. The kinds of harm that may support such a claim include interference with a shareholder's right to vote or right to inspect corporate records, *see Shenker*, 983 A.2d at 424, receipt of a lesser value by shareholders for their shares in a cash-out merger, *id.* at 425, use of a reverse split and elimination of

fractional shares for the purpose of eliminating minority stockholders, *Lerner*, 750 A.2d at 720, uneven distributions to shareholders, *Lyon v. Campbell*, 33 F. App'x 659, 663-64 (4th Cir. 2002) (unpublished), or an inability to sell one's shares to a willing buyer because of the unlawful acts committed by one in a fiduciary capacity, *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 734 (D. Md. 2001). *See also Geo. Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 14 A.3d 1193, 1207 (Md. Ct. Spec. App. 2011) ("Because directors' fiduciary duties relating to management do not extend to shareholders, a minority shareholder generally does not have a direct action for breach of those duties against the directors, except in cases affecting fundamental shareholder rights (*e.g.*, a shareholder's right to require the corporation to buy its stock, known as an appraisal right).").  Those types of harms to shareholders are distinct from any harm that might have been sustained by a corporation.  In this case, Giddens has alleged either self-dealing or wasting of corporate assets.  Consequently, the harm she has alleged is one to the corporation and not distinctly or directly one to her.  Her effort to come through the back door of such a claim and assert that CorePartners is less able to pay her the damages she believes she is owed and, therefore, she has suffered a distinct and direct harm, is unavailing.  Giddens's claim of direct harm is somewhat analogous to the plaintiff's claim in *Mona v. Mona Elec. Group, Inc.*, 934 A.2d 450 (Md. Ct. Spec. App. 2007).  In that case, the plaintiff attempted to show that payments for salary and bonus to one shareholder (plaintiff was the only other shareholder) were excessive and, therefore, injurious personally to the plaintiff. *Id.* at 469.  The court dispensed with that argument:

> It does not follow that, merely because [the company] has two shareholders . . ., an overpayment of compensation to [one] is a loss to [the other]. . . . Any wrongful overpayment by the company of compensation to an officer is at most a loss to the company.

*Id.*

The facts Giddens has alleged do not support a claim for relief. Anticipating this possible outcome, she has argued she should be permitted to amend her complaint to include a claim of unjust enrichment against CorePartners as well as Oykhman, Hadshi, and Damiano. (Pl.'s Opp. 9, ECF No. 27.) She contends,

> More specifically, Plaintiff should be permitted to state a claim against CorePartners for its improper retention of monies due to Plaintiff both contractually and through CorePartners' violation of the Wage Payment Act. Further under Kann and its progeny, Plaintiff should be permitted to clarify the specific cause of action that the Individual Defendants' breach of fiduciary duty gives rise to. Finally, per the well-established principle under Maryland law that officers of a corporation may be held personally liable for wrongdoing that is based on their decisions, Plaintiff should be permitted to assert a claim against the Individual Defendants based on their active participation in ensuring that CorePartners did not honor its obligations to Plaintiff, but instead wrongfully has retained monies otherwise due and owing to Plaintiff.

(*Id.*)

She has cited no authority for the proposition that one can sue a defendant for unjust enrichment for "improper retention of monies" that are due under a contract or under the MWPCL. This approach once again mixes the theories of recovery. If she is due money under a contract, then her remedy is suit for breach of contract. If she is due money under the MWPCL, then her remedy is suit for a statutory violation. Maryland law is clear that a claim for unjust enrichment is not appropriate to the facts of this case:

> There was an express contract between the parties that controlled this subject matter; therefore, respondent cannot seek relief through the quasi-contractual remedy of unjust enrichment. We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists.

*County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 610 (Md. 2000). Plaintiff's attempt to add a layer of unjust enrichment to her existing claims is improper. This conclusion not only applies to her contract theory but also logically extends to the MWPCL claim. The latter just as clearly defines the rights and remedies of the parties as the former. For

the foregoing reasons, Defendants' motion to dismiss Count III of the amended complaint will be granted, and Giddens's request for leave to amend is denied as futile.

### III. Plaintiff's Motion to Dismiss CC III and CC V-VIII of CorePartners's Counterclaim

Giddens has moved to dismiss the third, fifth, sixth, seventh, and eighth counts of CorePartners's counterclaim against her on the ground that they fail to state a claim for relief under Rule 12(b)(6).  (Pl.'s Mot. Dismiss, ECF No. 22.)  The Court will consider each of these in turn.

#### A. CC III:  Breach of Contract—Personal Expenses

In CC III, CorePartners alleged it and Giddens "entered into a contract by which CorePartners would permit Giddens to make purchases on her corporate credit card and Giddens agreed to repay CorePartners for her personal expenses out of her compensation or otherwise." (Ans. & Counterclaim ¶ 33, ECF No. 8.)  CorePartners further alleged the two parties "abided by these terms over a course of time, with Giddens charging personal expenses to her corporate credit card and CorePartners taking such advances as deductions from her paycheck" (*id.* ¶ 34) and, following Giddens's departure, she "failed and refused to repay CorePartners for $11,276.47 of personal expenses charged to her business credit card" (*id.* ¶ 35).

Giddens contends CC III is subject to dismissal on two grounds:  one, the "contract" is too vague and indefinite to be enforceable; and two, Maryland law explicitly prohibits its purported terms.  As to the first ground, Giddens points to several perceived infirmities occasioned by the absence of allegations as to the nature or scope of the contract; whether the contract was written or oral; the term of the contract or the consideration exchanged; a definition of "personal expenses"; when Giddens would be required to repay the charges; and the definition of "otherwise."  (Pl.'s Supp. Mem. 3-4, ECF No. 23.)

The standard in Maryland for an enforceable contract is the following:

> For a contract to be legally enforceable, its language must not only be sufficiently definite to clearly inform the parties to it of what they may be called upon by its terms to do, but also must be sufficiently clear and definite in order that the courts, which may be required to enforce it, may be able to know the purpose and intention of the parties.

*Robinson v. Gardiner*, 76 A.2d 354, 356 (Md. 1950).

Since CorePartners neither offers an allegation of a written contract nor attaches one to its counterclaim, the Court presumes it is proceeding on a theory of oral contract, which may be either express or implied in fact. In *J. Roland Dashiell & Sons*, the Maryland Court of Appeals noted the differences between the two:

> An express contract has been defined as "an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing." "An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and 'the ordinary course of dealing and the common understanding of men.'"

747 A.2d at 606 (citation omitted). "Acceptance can be accomplished by acts as well as words." *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090 (Md. 1979), *quoted in Thomas v. Capital Medical Management Associates, LLC*, 985 A.2d 51, 63 (Md. Ct. Spec. App. 2009). But if any essential term of the alleged contract is vague, indefinite, or uncertain, then an enforceable contract has not been created. *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police, Inc. v. Md. Transp. Auth.*, 5 A.3d 1174, 1194 (Md. Ct. Spec. App. 2010), *rev'd on other grounds*, 2011 WL 2437371 (Md. 2011). Although courts will, to the extent possible, construe a contract to carry out the reasonable, ascertainable intentions of the parties, they "may not cure indefinite or vague contract language by supplying missing contract terms or definitions." *8621 Ltd. Partnership v. LDG Inc.*, 900 A.2d 259, 266-67 (Md. Ct. Spec. App. 2006).

The Court concludes that CorePartners has adequately alleged that an enforceable contract existed between the parties that permitted Giddens to charge personal expenses to her assigned corporate credit card and, in return, permitted CorePartners to deduct the same from her paycheck for as long as she was employed with CorePartners. Defendant alleges that the parties' conduct conformed to this contract for several months, and it is appropriate to consider their course of dealing to interpret the contract. In that respect, the definition of "personal expenses" may be reasonably ascertained by considering what charged items were claimed and reimbursed as personal expenses. The difficulty with CorePartners's counterclaim is the allegation that Giddens "agreed to repay CorePartners for her personal expenses out of her compensation *or otherwise*." The term "or otherwise," presuming the parties even articulated such, is surely too vague to permit an enforceable interpretation. In effect, CorePartners is asking the Court to construe "or otherwise" as something akin to an "IOU" that would survive the employment relationship. To do so would be contrary to Maryland law because it would amount to the Court's supplying a missing term or definition. *See 8621 Ltd. Partnership*, 900 A.2d at 266-67. To the extent, therefore, that CorePartners seeks to have Giddens bound by the contract beyond her resignation, the Court concludes it is unenforceable. For that reason, CC III must be dismissed.

### B.  CC V:  Promissory Estoppel

CorePartners pleaded, as alternatives to its counterclaim for breach of contract relating to Giddens's charged personal expenses, counts for unjust enrichment and promissory estoppel. Giddens has moved to dismiss the count for promissory estoppel for failure to state a claim.

In *Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc.*, 674 A.2d 521 (Md. 1996), the Maryland Court of Appeals set out the four elements of promissory estoppel, which it preferred to name as detrimental reliance:

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

*Id.* at 532 (emphasis omitted). The *Pavel Enterprises* court emphasized that detrimental reliance, if proved, establishes a contractual relationship between the parties. *Id.* at 534. Thus, it is not an alternative to contract; it *is* a contract. *See also Harford Co. v. Town of Bel Air*, 704 A.2d 421, 430 (Md. 1998) ("the undertakings in the 1969 agreement amount to 'a benefit to the promisor or a detriment to the promisee' sufficient to constitute 'valuable consideration'").

Because the concept of vagueness applies to contracts, it applies equally to this species of contracts. *See Mogavero v. Silverstein*, 790 A.2d 43, 51 (Md. Ct. Spec. App. 2002) ("the alleged agreement between the parties is too vague and indefinite to prove the first prong of the test set forth in *Pavel*"). As already noted, the vagueness in the term "or otherwise" resulted in an unenforceable contract beyond the term of Giddens's employment because the parties' agreement only extended to payroll deductions while she was employed with CorePartners and not beyond that time. Detrimental reliance by CorePartners—by allowing Giddens to charge personal expenses on her corporate credit card—does not cure this vagueness in the first element under the *Pavel Enterprises* test, i.e., a clear and definite promise. *See also Konover Property Trust, Inc. v. WHE Associates, Inc.*, 790 A.2d 720, 724-25 (Md. Ct. Spec. App. 2002) ("At best,

there was an implied understanding or an implied agreement. That is quite dissimilar from a clear and definite promise."). Accordingly, CC V will be dismissed.[1]

### C. CC VI: Computer Fraud and Abuse Act

In this count, CorePartners alleges Giddens violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* Basically, section 1030 makes illegal the unauthorized access of a protected computer and intentional misuse or destruction of information on such a computer. It also permits a private, civil action by "[a]ny person who suffers damage or loss by reason of a violation of this section" for compensatory damages and injunctive or other equitable relief. 18 U.S.C. § 1030(g). CorePartners alleges, in a conclusional fashion, that Giddens

> wrongfully and intentionally accessed, copied, destroyed, interfered with, and/or caused the transmission of information, including confidential information, from CorePartners' computers and/or computer systems used in interstate commerce[,] . . . wrongfully and intentionally obtained and/or destroyed confidential business records from CorePartners from such computers, . . . [and] improperly shared CorePartners' confidential business information with third parties.

(Ans. & Counterclaim ¶¶ 47-49, ECF No. 8.) It is incumbent upon one pleading a claim to plead sufficient *facts* to permit a court to conclude that misconduct occurred. Here, CorePartners has pleaded no facts whatsoever but only a string of conclusions. Nor is it ever alleged that Giddens's access to any CorePartners computer was unauthorized. The count fails to state a claim for relief and will be dismissed.

### D. CC VII: Trover and Conversion—Wrongful Taking

The next count in the counterclaim is similar to the preceding one. It is also premised upon alleged wrongful conduct in relation to computer files, but suffers from the same deficiency as CC VI. It lacks sufficient facts to permit the Court to conclude Giddens engaged in misconduct, and it will also be dismissed.

---

[1] The Court in no way addresses the merits of the counterclaim for unjust enrichment, which does not depend upon principles of contract law for decision.

### E. CC VIII: Breach of Fiduciary Duty—Computer

In yet another version of allegedly wrongful conduct by Giddens with computers, CorePartners has prefaced its conclusions with an allegation that Giddens was accountable to CorePartners as a fiduciary based upon her status as a director and breached that duty. (*Id.* ¶¶ 58-61.) This count will meet the same fate of dismissal for failure to state a claim.

### IV. Plaintiff's Motion for Partial Summary Judgment on Count II

The last motion to be considered here is Giddens's motion for partial summary judgment on Count II of her amended complaint. She seeks this Court's judgment of liability on this claim brought pursuant to the MWPCL and she seeks a ruling that CorePartners's decision to withhold her wages was not the result of a bona fide dispute. (Pl.'s Mot. 1, ECF No. 30.) Her MWPCL claim has three components: accrued vacation and sick leave; salary for September 2010; and annual bonuses. Giddens emphasizes that the amounts of the wages she alleges are due to her are disputed by the parties; she is only seeking a ruling as to CorePartners's obligation to pay her under the MWPCL. (Pl.'s Supp. Mem. 5-6 nn.2-5, ECF No. 30.)

#### A. Accrued Vacation and Sick Leave

Giddens refers to two paragraphs of the employment agreement to support her argument that, upon termination of her employment, she is entitled to unused portions of her allotted four weeks of paid vacation and seven days of paid sick leave annually. She cites paragraphs 2.9 and 4.2. (*Id.* 5.) The Court presumes that she refers to paragraph 2.6 since none labeled paragraph 2.9 appears in the copy attached to her motion.

Paragraph 2.6 reads as follows:

> <u>Termination Payments</u>. In the event Employee's employment is terminated for Cause, Employee shall only receive unpaid, but earned portions of her base salary and benefits through the effective date of her termination. Except as expressly set forth herein, the Employee shall have no right to receive any compensation or benefit hereunder on and after the effective date of the notice of

actual termination other than salary and other benefits earned and accrued prior to the date of termination. No provision of this Agreement shall limit any of the Employee's rights under any insurance, pension or other benefit program of the Company for which the Employee shall be eligible or otherwise vested at the time of such termination.

Although the paragraph only addresses termination for cause, it would be nonsensical to think that Giddens was not entitled to unpaid but earned salary and benefits if the company terminated her without cause or if she resigned. Nor has CorePartners argued that Giddens forfeited unpaid but earned salary and benefits because of her resignation. Consequently, the Court assumes that, regardless of how her employment with CorePartners is terminated, she is entitled under the employment agreement to be paid for all unpaid but earned salary and benefits through the effective date of her termination. Paragraph 4.2 simply notes that Giddens was entitled to four weeks of paid vacation and seven days of paid sick leave "annually in accordance with policies established by the Company generally for executive employees, and time off for all standard holidays."

By Giddens's calculations, she was entitled to 160 hours of vacation leave and 56 hours of sick leave for the calendar year 2010. (Pl.'s Supp. Mem. 5, ECF No. 30.) She notes that CorePartners alleged she had used 42.5 of the total, which would leave 173.5 hours for which she was not paid prior to her termination. (*Id.* 5-6.) CorePartners sent her a check on October 28, 2010, for an amount equal to its calculation of hourly pay for 74.67 hours of accrued vacation and 26.83 hours of accrued sick leave (Am. Compl. ¶ 38; Ans. ¶ 38); thus, the total number of hours for which CorePartners has paid her, after her termination, is 101.5, which is 72 hours short of what Giddens says she is due.[2]

_____

[2] To make these calculations, Giddens used the hourly wage rate of $48.08, which is what CorePartners has averred to be the proper rate. In reality, she disputes that this is the proper rate, claiming instead that it should be $50 per hour. (Am. Compl. ¶ 38, 39; Ans. ¶ 38, 39; Pl.'s Supp. Mem. 5-6 nn.3-5.) The Court is not, at this juncture, resolving the proper hourly wage

Given her calculations, Giddens seems to be asserting that she accrued all of her paid vacation leave and all of her paid sick leave for the calendar year 2010 at the beginning of that calendar year. CorePartners, on the other hand, points to its employee handbook to support its argument that the process of accrual continued throughout the calendar year rather than occurring at one fell swoop. CorePartners's employment manual provides the following, in pertinent part, as to vacation and sick leave:

**6.2    Vacation Time**

. . .

Full time employees will receive 2 weeks (10 days) of paid vacation for years 1-4 of employment on their date of hire anniversary. For years 5+ employees will receive 3 weeks (15 days) paid vacation per year on their date of hire anniversary. Part time employees who are eligible for paid vacation benefits will receive vacation on a pro rata basis based on the average hours of work performed in the previous year, or, in the event of a new employee, the months preceding the vacation request.

Any vacation time that is left unused by the employee's date-of-hire anniversary will be forfeited for use or payment in the subsequent employment year. . . .

**6.3    Sick Leave**

Sick leave may be used during an employee's own illness or for an illness in the employee's immediate family. Sick leave will be limited to four (4) 8-hour days per year for all regular full-time employees. Eligible part time employees will receive sick leave on a pro rata basis based on the average hours of work performed in the previous year, or, in the event of a new employee, the months preceding the sick leave request. . . .

(Pl.'s Mot. Ex. A, Att. Ex. 4.)

In light of the proviso in Giddens's employment agreement that she was entitled to vacation leave and sick leave "annually in accordance with policies established by the Company

---

rate, reserving the resolution of that question for a later point in the proceedings. But for the purpose of deciding whether partial summary judgment is warranted on this aspect of the MWPCL count, the Court is relying upon the figure of $48.08 per hour because it comes closer to the acknowledged annual salary of $100,000 than Giddens's figure of $50 per hour.

generally for executive employees," the argument made by CorePartners is a reasonable one. The employment manual can be fairly interpreted as indicating an employee only becomes entitled to vacation leave upon the anniversary date of employment. Such an interpretation, if strictly made, would even negate the inference suggested by CorePartners, i.e., that an employee becomes entitled to vacation leave on an incremental, accrued basis prior to the anniversary date. Considering that CorePartners is not itself advancing such an extreme interpretation, the Court accepts its argument that vacation leave is accrued during the course of the year. In accordance with that interpretation, the Court holds that Giddens is entitled only to the unpaid vacation leave she accrued—on an incremental, pro rata basis—up through the date of her termination.

As for sick leave, the employment manual is silent as to the time an employee becomes entitled to it. However, it is reasonable to infer that the incremental, accrued approach is equally applicable to sick leave as it is to vacation leave. Therefore, the Court holds that Giddens is entitled only to the unpaid sick leave she accrued—on an incremental, pro rata basis—up through the date of her termination.

The Court is only ruling on the obligation of CorePartners to pay Giddens for accrued, unpaid vacation leave and sick leave and is not ruling on the number of hours that fit that description; nor is the Court ruling on the money attached to any unpaid hours of vacation or sick leave. Insufficient evidence is before the Court to make such calculations. Consequently, it is not possible now to rule on whether Giddens has established a violation of the MWPCL on this point, even though the timing of CorePartners's payment to Giddens seems to be a matter of legitimate concern based on the statute's requirements.

### B. Salary for September 2010

Giddens next contends that CorePartners's delay in paying her September 2010 salary was a clear violation of the MWPCL because no bona fide dispute existed as to whether she was owed the amount. As a result, she asks for treble damages. (Pl.'s Supp. Mem. 13.)

Giddens worked September 1 and 2 in 2010. Thus, she was entitled to two days' pay. According to the employment manual, she was, as a regular full-time salary employee, to be paid semimonthly—on or by the 15th of the month and on the last day of the month. (Pl.'s Mot. Ex. A, Att. Ex. 4, ¶ 4.5.) It is unknown whether the payday on September 15th was for amounts earned in the first half of that month, but the Court assumes so. Giddens was apparently not paid on the 15th, however. She was paid on October 22, 2010, for these two days. In between September 15 and October 22, her counsel corresponded with CorePartners's counsel, who acknowledged in a letter dated September 28 that Giddens had not been paid, either for the two days of salary or for the vacation and sick leave, but further noted the past practice of offsetting salary with Giddens's personal expenses charged to her corporate credit card and, accordingly, inquired how Giddens wanted to handle this. (*Id.* Att. Ex. 7.) In particular, the company's counsel noted that the amount of unpaid personal expenses was substantially more than the amount of unpaid salary and leave. (*Id.*)

Giddens's counsel responded on October 5 by asking for a copy of the "loan" agreement and demanding compliance with relevant wage and salary payment statutes. (Def.'s Opp. Ex. 9, ECF No. 35.) Counsel for the two parties then exchanged several email messages. In one dated October 18, CorePartners's counsel stated the company had no dispute with the two days of regular pay and said she would direct the company to send a check for that amount to Giddens. (*Id.* Ex. 10.)

CorePartners, as an employer subject to Maryland law, was subject to the following provision of the MWPCL:

> [E]ach employer shall pay an employee or the authorized representative of an employee all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated.

Md. Code Ann., Lab. & Empl. § 3-505(a) (LexisNexis 2008). Additionally, the MWPCL provides:

> Notwithstanding any remedy available under § 3-507 of this subtitle, if an employer fails to pay an employee in accordance with § 3-502 or § 3-505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages.

Md. Code Ann., Lab & Empl. § 3-507.2(a) (LexisNexis Supp. 2010). Also, the MWPCL provides as follows:

> If, in an action under subsection (a) of this section, a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.

§ 3-507.2(b).

Thus, because the payment was not timely made according to the statute, the question arises whether the delay in payment from September 15 to October 22 was not as a result of a bona fide dispute. If it was not, then the Court would have discretion to award Giddens an amount not exceeding three times the wage, plus reasonable counsel fees, and other costs. § 3-507.2(b).

Based on CorePartners's counsel's concession that no dispute existed as to the two days of pay, it appears impossible for CorePartners to establish a bona fide dispute on this point. In fact, CorePartners presents almost no argument in the matter. With regard to the amount of salary due, it says:

> [T]here was and remains a bona fide dispute with respect to what amount of salary . . . Plaintiff was entitled to at the time of her resignation.

(Def.'s Opp. 12.)

> With respect to her salary, Plaintiff also admits that she has been paid all of the salary she was entitled to receive. At most, with respect to her salary, Plaintiff argues that CorePartners' [sic] paid her two days of September salary (for a total of $769.28) approximately 5 weeks later then [sic] she should have been paid.

(*Id.* 13.)

> Based on this five week delay of payment of her two days of salary, . . . Plaintiff argues she should be automatically awarded treble damages by this Court. Plaintiff is not entitled to treble damages, however, as CorePartners will show that there was a bona fide dispute between the parties as to what amounts, if any, she was owed for salary . . . .

(*Id.*)

> [I]t would be inappropriate at this stage, where discovery has not yet even commenced, for the Court to award treble damages without allowing CorePartners the opportunity to present any evidence of the bona fide disputes it had with Plaintiff with respect to these payments.

(*Id.* 14.)

Thus, while claiming it has evidence to present of a bona fide dispute as to whether it owed Giddens for the two days of salary, CorePartners has chosen not to present it now. Instead, it makes a vague promise to present it in the future. When faced with a motion for summary judgment, or partial summary judgment as in this case, it is no answer for the nonmovant to tell the Court it plans to present some evidence down the road. The time to present one's evidence is at the time of filing one's opposition to summary judgment. CorePartners offers no clue as to what its evidence might be on this point or why it is not possible for it to present the evidence now.

Consequently, the Court concludes that CorePartners has failed to establish the existence of a bona fide dispute as to why it did not pay Giddens for the two days of salary. Accordingly,

Giddens has shown that CorePartners violated the MWPCL by withholding undisputed wages from her for five weeks, and it is within the Court's discretion to fashion an award pursuant to section 3-507.2(b). However, because other issues remain unresolved, and because they may affect the calculation of damages, it is prudent to determine an appropriate award later in the proceedings when the rest of the case is decided. For now, the Court's ruling is limited to liability by CorePartners for the late payment of wages.

### C. Annual Bonuses

The last component in Giddens's claim under the MWPCL is her asserted entitlement to unpaid bonuses for 2008, 2009, and 2010. Since the employment agreement between Giddens and CorePartners unequivocally grants her an annual bonus, and since the only bonus she received was for 2007, it is up to CorePartners to establish that the agreement does not apply to her claim for the remaining two full years and one partial year she was employed with the company.

CorePartners attempts to do this by relying upon a statement by Oykhman:

> **7.** Notwithstanding the provision in the Agreement requiring modifications to be in writing, in or around January 2008, Plaintiff met with Defendant Boris Hadshi and I, and the three of us verbally agreed that Plaintiff would transition from receiving a salary and a formula-based bonus, as provided in the original Agreement, to become a director and shareholder of the Company, receiving the same salary as Mr. Hadshi and I received ($100,000 per year), plus one-third (1/3) of certain distributed profits.

> **8.** CorePartners and Plaintiff thereafter adhered to this modified agreement. Indeed, in 2008 Plaintiff bought shares of the Company, and in 2009 and 2010 Ms. Giddens was paid $40,000 and $10,000, respectively, as her share of the profits of the Company, in lieu of the previously agreed upon bonuses. Plaintiff's profit sharing payments were identical to payments made at the same time to myself and Mr. Hadshi, the Company's other shareholders.

(Def.'s Opp. Ex. 1.)

If this amounted to a modification of Giddens's agreement with CorePartners, then it would be a verbal modification of an agreement that explicitly required any modification to it to be in writing. Whether a verbal modification under that circumstance would be valid is, however, unnecessary for the Court to resolve because all that CorePartners has established, viewing this evidence in its favor as the nonmovant, is an intent that Giddens "**would transition**" from being paid a salary, annual bonuses, and discretionary spot bonuses to being a director and shareholder being paid a yearly $100,000 salary plus one-third of "***certain distributed profits***." The terms highlighted by the Court are fatally vague. In other words, if Giddens were trying to enforce this "modification" against CorePartners, the Court would rule against her because the language is too vague to define the timing of the transition and to define "certain distributed profits." Consequently, this attempted modification is ineffective and unenforceable by either party.

The Court's interpretation of this language is reinforced by two other pieces of evidence. First, the evidence that Giddens became a minority shareholder is completely consistent with her status as an employee governed by her employment agreement. On that point, it is a matter of common knowledge that employees of corporations not infrequently become shareholders in the private companies for which they work. By itself, an acquisition of stock in a company does not change an employee's status as an employee or cause a diminishment of employment benefits. In fact, examination of the two additional agreements before the Court, the stock purchase agreement and the joinder agreement, allows the conclusion that they did not alter either Giddens's status as an employee or her benefits.

Second, the evidence shows that Giddens never became a director. CorePartners attached to its opposition an Exhibit 9, which included the notes taken by Giddens at the shareholders'

meeting on July 21, 2010. Although these notes are somewhat cryptic because they do not necessarily comprise complete sentences, they clearly show the following:

- As of that date, the board of directors was composed of Oykhman, Hadshi, and Damiano.

- Hadshi inquired whether Oykhman thought Giddens should be made an officer.

- Oykhman believed Giddens did not want to be made an officer.

- Giddens clarified her becoming a director was not her primary motivation for working with CorePartners.

- Hadshi stated his opinion that Giddens should be made an officer.

- Giddens inquired about the board's activities, roles, and responsibilities.

- Hadshi moved to add Giddens to the board.

- Giddens said she would provisionally accept the board nomination if CorePartners purchased directors' and officers' liability insurance.

- Hadshi deferred further discussion of the board election to allow time for Giddens to submit notes from the July 21 meeting and for further consideration of roles, responsibilities, etc.

The Court concludes Giddens never became a director of CorePartners. Consequently, the employment agreement of January 5, 2008, governed Giddens's employment status and, in particular, her entitlement to annual bonuses. Because MWPCL's definition of "wage" includes "a bonus," CorePartners is liable to Giddens for unpaid bonuses from 2008, 2009, and 2010. Calculation of the precise amount will be made in later proceedings when all damage issues are resolved.

*V.  Conclusion*

All three motions before the Court will be granted by separate order to the extent reflected in this memorandum.

DATED this <u>18th</u> day of July, 2011.

<div style="margin-left:45%;">

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge

</div>